UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 00-27(DSD/JMM)

American Family Insurance Group,

Plaintiff,

v.

**ORDER**

JVC Americas Corp.,

Defendant.

Richard S. Stempel, Esq.,Michael W. Lowden, Esq. and Stempel & Associates, 41 12th Avenue North, Hopkins, MN 55343, counsel for plaintiff.

Daniel J. Connolly, Esq., Amy R. Freestone, Esq. and Faegre & Benson, 2200 Norwest Center, 90 South Seventh Street, Minneapolis, MN 55402, counsel for defendant.

This matter is before the court on defendant's motion in limine to exclude expert testimony and for summary judgment. Based on a review of the file, record and proceedings herein, the court grants defendant's motion in limine and motion for summary judgment.

## BACKGROUND

This products liability lawsuit arises from an allegation that a JVC compact disc player caused a fire at a home insured by American Family Insurance Group ("American Family"). American

APR 3 0 2001
FILED
FRANCIS E. DOSAL, CLERK
Judgment Ent'd. APR 3 0 2001
Deputy Clerk's Initials

Family sued JVC Americas Corp. ("JVC") to recover insurance benefits paid for damage to its insureds' home.

On July 1, 1998, fire damaged the residence of Thomas and Rebecca Headline Kilbury. On July 13, 1998, the Kilburys' homeowner insurer, American Family, sent its investigator Thomas Haney to inspect the fire scene. Haney walked through the home and had a brief discussion with the Kilburys. A Minneapolis Fire Department investigator had preliminarily concluded that a fan in an upstairs bathroom caused the fire. However, based on his own analysis of the fire and burn patterns in an adjacent bedroom, Haney concluded that the electrical artifacts from both the bathroom and bedroom should be examined by an electrical engineer to determine the possible cause of the fire. Haney returned to the scene the next day along with engineer Daniel Choudek. Choudek removed the charred remains of a bathroom exhaust fan, as well as a clock, a lamp, a timer, a JVC compact disc player, a computer printer, monitor and hard drive, a ceiling fan, one power receptacle and a power strip from the northwest bedroom.

Choudek inspected the various electrical artifacts but conducted almost no testing on any of the remains or exemplars. Based solely on his visual observations of the fire and burn patterns in the room and on the appliance remains, and also on his education, training and experience, Choudek opined that a defect in the JVC PC-X110 compact disc player caused the fire in the Kilbury

home. JVC challenges Choudek's qualifications to render this opinion and further contends that Choudek's theory and methodology fail to satisfy the requirements for expert testimony under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). JVC brings a motion in limine to exclude Choudek's testimony and a concurrent motion for summary judgment based on an absence of credible expert testimony as to causation.

## DISCUSSION

### I. Motion in Limine

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702. As the Supreme Court has instructed, the district court has a "gatekeeping" obligation to make certain that all testimony admitted under Rule 702 "is not only relevant, but reliable." Daubert, 509 U.S. at 589, 597-98 (citing Fed. R. Evid. 104(a)). See also Kumho, 526 U.S. at 146 (expressly extending Daubert to technical and other specialized expert testimony).

In Daubert, the Supreme Court identified four factors for district courts to use in determining the admissibility of expert testimony pursuant to Rules 702 and 104 of the Federal Rules of Evidence: (1) whether the expert's hypotheses can be or have been tested; (2) whether the expert's methodology has been subjected to peer review; (3) the rate of error associated with the methodology, and (4) whether the methodology is generally accepted within the scientific community. Daubert, 509 U.S. at 593-94. These factors are not exclusive and the court's inquiry is "a flexible one ... tied to the facts" of the case. Kumho at 1175 (quoting Daubert, 509 U.S. at 591, 594). See also Jauregui v. Carter Mfg., Inc., 173 F.3d 1076, 1983 (8th Cir. 1999) (emphasizing that "the district court must customize its inquiry to fit the facts of each particular case.").

Choudek is prepared to testify that the fire in the Kilbury home originated along the west wall of the northwest corner bedroom, specifically on the dresser top in the vicinity of the JVC PC-X110 stereo. In Choudek's opinion, a defect in the attachment pins to the Printed Circuit Board (PCB) of the stereo caused the fire. JVC contends that Choudek's proffered testimony fails to meet the Daubert criteria for evidentiary reliability.

**A. Qualifications:**

As an initial matter, the court reviews Choudek's qualifications as a expert in this case. To qualify as an expert

under Rule 702, a witness must first establish his expertise by reference to "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Choudek is a professional engineer with a B.S. in electrical engineering. He has fourteen years of experience in the engineering field and has been licensed as an engineer in the State of Minnesota since 1997. He is not a certified fire investigator and has no formal training in fire cause and origin analysis. Nevertheless, in his report he asserts that the fire in the Kilbury home originated on the dresser top in the vicinity of the JVC PC-X110 stereo. (Freestone Aff. Exh. 5.) He bases that opinion on "the examination of the scene, the fire and burn patterns at the scene on the furniture." (Lowden Aff. Exh. E, Choudek dep. p. 59.)

The court does not question Choudek's credentials to testify about fire origin in his capacity as electrical engineering expert. However, his generalized assertions that he has attended fire investigation seminars and received "on-the-job training" during his investigation of 600-plus fires does not necessarily qualify him to render broader opinions about fire scene analysis and fire origin. Although the competence requirement under Rule 702 has always been treated liberally, this "does not mean that a witness is an expert simply because he claims to be." Pride v. Bic Corp., 218 F.3d 566, 577 (6th Cir. 2000). See also General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("[N]othing in either Daubert or

the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert."); Weisgram v. Marley Co., 169 F.3d 514, 518-519 (8th Cir. 1999), aff'd, 528 U.S. 440 (2000)(fire and causation expert who admitted he was not "an electrical expert" was not qualified to testify that cause of a fire was heater malfunction).

The court's concern regarding Choudek's proper area of expertise is heightened by the fact that defendant's fire investigator contacted Choudek specifically to obtain an engineering analysis of the potential electrical sources of the fire, and not a general fire origin analysis. (Freestone Aff. Exh. 6, Haney dep. pp. 29, 39-40.) Therefore, absent further foundation regarding Choudek's training and experience, the court finds that Choudek is not qualified to offer a broad analysis of the fire and burn patterns in the bedroom or general fire origin theory.

**B. Theory and Methodology**

In 1995, the National Fire Protection Association adopted Standard 921, entitled "Guide for Fire and Explosion Investigations (NFPA 921)". NFPA 921 specifically endorses the scientific method for use in fire investigations. For example, NFPA 921 states: "The systematic approach recommended [for a fire investigation] is that of the scientific method, which is used in the physical sciences. This method provides for the organizational and analytical process

so desirable and necessary in a successful fire investigation." NFPA 921 § 2-2, at 921-9. Further, "[u]se of the scientific method dictates that any hypothesis formed from an analysis of the data collected in an investigation must stand the challenge of reasonable examination." NFPA 921 § 12-6, at 921-79 (citing Daubert).

Plaintiff and Choudek debate whether NFPA 921 is actually a "standard," or merely a "guide." Regardless, the NFPA, of which Choudek is a member, emphasizes that the use of the scientific method is appropriate in reaching conclusions as to fire cause and origin.[1] The NFPA allows for some flexibility in analytical methods, however as defendant's expert Richard Dyer testified: "if you do not use certain portions of the document on certain investigations, that is acceptable but then you should be able to explain why it wasn't necessary."[2] Similarly, Daubert and its progeny make clear that "[p]roposed [expert] testimony must be supported by appropriate validation." Daubert, 509 U.S. at 590.

Choudek's basic theory in this case is that a defect in the attachment pins to the Printed Circuit Board (PCB) of the stereo

---

[1] The scientific method involves six steps: (1) recognizing the need for investigation; (2) defining the problem; (3) collecting the data; (4) analyzing the data; (5) developing a hypothesis, and (6) testing the hypothesis. NFPA 921 §§ 2-3.1 to 2-3.6, at 921-9 to 921-10.

[2] Dyer is the former Chief Deputy State Fire Marshal for the state of Missouri and Chief of the Lee's Summit, Missouri Fire Department. He is a certified fire investigator and member of the NFPA committee that drafted Standard 921. (Dyer dep. Exh. 1).

caused the fire that damaged the Kilbury home. In reaching that conclusion, Choudek neither applied the methodology recommended by the NFPA nor satisfied the requirements for expert testimony under Daubert.

To begin his analysis, Choudek relied entirely on the conclusion that the fire originated on the west wall of the bedroom.[3] He then focused his analysis on the electrical appliances located on or near that wall. Based primarily on his visual analysis of the plastic housing remains and burn patterns, he quickly eliminated the computer CPU, monitor and printer as sources of ignition. He conducted no testing on the computer components, but rather relied on prior tests he had performed on other electrical devices with plastic housing, mainly coffee makers. (Choudek dep. pp. 83-85.) He admits that his theories regarding fire consumption of plastic housing and the resulting burn patterns are not addressed in any engineering or fire science textbooks. (Choudek dep. p. 84.)

After eliminating the computer components as a source of the fire, Choudek focused his attention on the JVC stereo. He set fire to certain portions of the stereo to determine if they would burn, but apart from that limited experiment, he performed no tests on

[3] As discussed above, the record does not establish that Choudek was qualified to make the determination that the fire originated on the west wall dresser top area. However, Choudek's conclusion in this regard matches with the opinion of American Family's qualified fire expert, therefore Choudek's testimony need not be precluded on this basis. (Haney dep. p. 34.)

the exemplar unit that was obtained for him. He concluded, nonetheless, that some form of mechanical stress had been applied to the attachment pins the JVC stereo unit in the Kilbury home, which resulted in localized heating and eventual combustion. (Choudek dep. p. 108.)

When asked at his deposition how he had determined that stress had occurred, he responded that he had observed stress on the attachment pins of "devices like these" and was aware that JVC installed a brace near the attachment pins, presumably to support the area in time of stress. (Choudek dep. p. 112.) At one point in his deposition, he also speculated that the stress could occur if the stereo was plugged in and out "several times" or was "pushed up against the wall." (Choudek dep. p. 113.) However, he made no attempt to determine through independent research and testing whether such mechanical stress could occur, whether it could produce fire and if so, how much stress was required to generate sufficient heat energy to produce fire. (Choudek dep. p. 117.) He did not speak to the Kilburys about the manner in which they used the stereo and did not even ascertain if the unit was plugged in at the time of the fire. (Choudek dep. pp. 79-82.)[4]

---

[4] Plaintiffs submit an affidavit of Thomas Kilbury that the power indicator lights and graphic displays were illuminated during the night prior to the fire. (Kilbury Aff. ¶ 3.) This contradicts the testimony of Thomas Haney, who indicated that the Kilburys were not certain if the stereo was plugged into the power strip. (Haney dep. p. 34.) Moreover, Choudek admits that he never affirmatively identified which items were plugged into the power strip. For (continued...)

As Choudek's own testimony reveals, his theory on the cause of the Kilbury fire is wholly deficient under Daubert. First, Choudek's conclusions are not supported by meaningful factual investigation. Moreover, Choudek failed to conduct replicable laboratory experiments demonstrating that the specific electrical appliances on the west wall would burn in the manner he believed they would. He suggests that conclusions from his prior experiments on small appliances are transferrable to the Kilbury fire, but admits that even those conclusions have not undergone the scrutiny of peer review. Most significantly, although an exemplar of the JVC PS-X110 was provided for his use, Choudek failed to perform any testing specific to his theory on the origin of the fire. Consequently, Choudek's opinion that mechanical stress occurred at the point of the attachment pins resulting in fire is pure speculation.

> Both Daubert, and Kumho, make it clear that the day of the expert, who merely opines, and does so on basis of vague notions of experience, is over. Experts are now held to a level of accountability that requires factual predicates, in historical fact, or in competent evidence, which allows a factfinder to independently verify the accuracy of the expert's results. Absent such reliable verification, the expert's opinion is not admissible.

---

[4] (...continued) these reasons, the Kilbury affidavit has no bearing on the issue of whether Choudek had a sufficient factual basis for his opinion.

Kemp v. Tyson Seafood Group, Inc., 2000 WL 1062105 at *7 (D. Minn. July 19, 2000).

Choudek's failure to test his hypotheses in a reliable manner or to validate his hypotheses by reference to generally accepted scientific principles as applied to the facts of this case renders his testimony on the cause and origin of the fire unreliable and therefore inadmissible under Daubert and Federal Rules of Evidence 702 and 104. For these reasons, JVC's motion in limine to exclude the testimony of Daniel Choudek is granted.

**II. Summary Judgment**

In Minnesota, a plaintiff in a products liability case must establish that the defendant's product was in a defective condition and unreasonably dangerous for its intended use, that the defect existed when the product left the defendant's control, and the defect was the proximate cause of the plaintiff's injury. See Lee v. Crookston Coca-Cola Bottling Co., 188 N.W.2d 426, 432 (Minn. 1971). Without Choudek's testimony, American Family is unable to establish either the existence of a defect in the JVC stereo or that the defect was the proximate cause of the fire in the Kilbury home. Accordingly, since American Family cannot establish two of the prima facie elements of its design defect claim, JVC is entitled to summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)(holding that if a plaintiff cannot support each essential element of its claim, summary judgment must be

granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial); Jaurequi, 173 F.3d at 1085 (concluding that without expert engineering testimony in a products liability case, plaintiff was left with no defense to summary judgment).

Plaintiff contends that the case should be allowed to proceed on circumstantial evidence of other problems with JVC stereo units. However, under Minnesota law, to survive summary judgment, inferences must be "reasonably supported by the available evidence; sheer speculation is not enough, and the inference of ... causation must outweigh contrary inferences." Illinois Farmers Ins. Co. v. Brekke Fireplace Shoppe, Inc., 495 N.W.2d 216, 221 (Minn. Ct. App. 1993) (citing Rochester Wood Specialties, Inc. v. Rions, 176 N.W.2d 548, 552 (Minn. 1970); Harvest States Coop. v. Phillips and Temro Indus., 2000 WL 760423 at *2 (Minn. Ct. App. 2000) (upholding summary judgment where plaintiff's fire causation theory was supported only by speculation derived from circumstantial evidence). See also Weisgram, 528 U.S. at 440 (noting that it is not reasonable to expect after Daubert that a party will initially present "less than [its] best expert evidence in the expectation of a second chance", then "shore[ ] up" its case after its expert testimony is ruled inadmissible). Lacking expert evidence on

causation, no reasonable jury could conclude that the JVC PC-X110 located in the Kilbury home was the source of the fire. Summary judgment for JVC is granted.

**CONCLUSION**

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Defendant's motion in limine to exclude the testimony of Daniel Choudek is granted.

2. Defendant's motion for summary judgment is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: April 30, 2001

David S. Doty, Judge
United States District Court

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.